**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Seymour J. LACOB, Defendant-Appellant.**
**No. 16747.**

United States Court of Appeals
Seventh Circuit.

Sept. 4, 1969.

Rehearing Denied Oct. 13, 1969.

Anna R. Lavin, Chicago, Ill., for appellant.

Thomas A. Foran, U. S. Atty., Richard A. Makarski, Asst. U. S. Atty., Chicago, Ill., for appellee, John Peter Lulinski, Michael B. Nash, Asst. U. S. Attys., of counsel.

Before SWYGERT and CUMMINGS, Circuit Judges, and MORGAN, District Judge.[1]

ROBERT D. MORGAN, District Judge.

Defendant was tried on Count III of an indictment charging income tax evasion for the calendar year 1960.[2] He was found guilty by a jury and has prosecuted this appeal from the judgment of conviction.

Defendant is a lawyer who specialized in personal injury claims. While he was represented by his present counsel in the proceedings prior to trial in this case, he chose to defend himself at the trial and his counsel of record was permitted to withdraw.

The indictment charged a false and fraudulent return, in violation of 26 U.S.C. § 7201, reporting taxable income of $8,329.70 with a tax of $1,765.72, while defendant's correct taxable income was $30,146.15 with a tax of $9,528.69.

The Government proved by records of two banks, without dispute, that defendant deposited slightly over $99,000 in 1960. It was stipulated that in 1960 defendant received 69 case settlement checks from 29 different insurance carriers totaling $38,322.89. $36,000 of that amount was identified among the deposits to defendant's bank accounts. $1,475 was proved to have been received but not deposited. Records of the Illinois Industrial Commission, received in evidence, disclosed 22 cases handled by defendant on which checks were issued in 1960, and $17,100 from those sources was traced into defendant's bank accounts. Checks for $1,477 from these latter sources were proved to have been received but not deposited.

An Internal Revenue Service accounting expert testified that he made a bank deposit analysis and various computa-

tions from the material in evidence. Deposits of $14,569.90 were eliminated and not considered as unreported income because they represented salary which was reported and small, and unidentifiable, checks. Also, deposits of $5,415.12 were eliminated as transfers from other accounts. Deposits of currency were also eliminated. Since the defendant received a fee of 33⅓% of personal injury settlements, defendant was charged with income of $6,206.90 on $18,620.89 of deposits of identified personal injury settlement checks and $491.67 on the $1,475 of personal injury settlements received but not deposited. Since the fee on workmen's compensation settlements was 20%, defendant was charged with income of $3,420 on the $17,100 of identified workmen's compensation settlement check deposits and $295.40 on the $1,477 workmen's compensation settlement checks which were not deposited. Of $39,356.33 of substantial checks deposited but not identified or explained, defendant was charged with income of $7,871.27, or 20%, because it was assumed, in the absence of other proof, that these were proceeds of cases and that his fee was the lower of the two fee bases used.

Defendant's 1960 taxable income was then recomputed by adding these items to the identified income shown on the return, allowing personal deductions and exemptions as claimed on the return and deducting $1,483 for bar association dues, filing fees, etc., which had not been claimed by defendant on his original return. This computation resulted in finding taxable income of defendant for 1960 of $25,131.94, with a tax due of $7,286 against the $1,765 returned, or an unreported tax for 1960 of $5,521.[3]

Defendant's efforts at proof of a defense were somewhat abortive. A judge of the Circuit Court of Cook County, Illinois, was not able to testify to defend-

---

1. Judge Morgan is sitting by designation from the Southern District of Illinois.

2. The trial court required the Government to elect one of four counts for trial.

3. Five checks paid to defendant in 1960 for services as a saxophonist in an orchestra, but not shown on his return, were also received into evidence.

ant's good reputation for truth and veracity in the community in which he resided, and two attorneys who did so thought that he lived in a community other than his place of residence as shown on his income tax return. Defendant sought to have his wife identify checks which he had made out, and, upon Government objection, the court did not permit her to do it, so the defendant took the stand to identify them himself. Based upon defendant's admissions that many of such checks covered expenditures which were charged to and, ultimately at least, paid by clients, and that he couldn't relate them directly to case files or other records, and upon Government objection that no proper foundation had been laid for their admission without invoices, files or book records showing that they were business connected expenses actually borne by defendant, the trial court excluded all the checks except some few to which such objection was not raised and for which defendant was given credit. A Certified Public Accountant was not permitted to testify about, or analyze, the checks which had not been admitted into evidence. Defendant testified that the checks which were excluded did represent expenses of his law practice for 1960 and that his expenses that year totaled more than his income. Accordingly, he argued that he had no net law practice income in 1960, and hence had reported none because he said he was advised that it was not necessary to detail the actual income and expenses.

As grounds for reversal, defendant urges that the Government was permitted to exceed a limiting effect of its Bill of Particulars to the defendant's prejudice; that the "bank deposit theory" employed in the Government's evidence was misused and may not, consistent with constitutional guarantees to the defendant, be the basis of a conviction; that the defendant was compelled to testify in violation of his constitutional privilege against self-incrimination; that by excluding his cancelled checks as exhibits, the trial court effectively denied defendant any jury consideration of his defense; and that six other alleged trial errors deprived defendant of due process of law.

■ There is no merit to defendant's first argument that the Government should have been limited to proving the items of unreported income specified in its Bill of Particulars, or to a specific-item method of proof, because the method or theory of proof to be relied upon by the Government was neither asked by the defendant nor stated by the Government and, in its Bill of Particulars, the items listed were clearly stated to be a "partial" list of payments made by "some" of the insurance companies which made payments to defendant in 1960. If this were not in compliance with the trial court's order under Rule 7(f) F.R.Crim.P., the defendant should have sought more complete particulars at that time, and certainly failure to do so may not change what is stated to be partial into a complete list to which the Government is thereafter limited in its proof. Nothing in United States v. Neff, 3 Cir., 212 F.2d 297, or United States v. Glaze, 2 Cir., 313 F.2d 757, cited by defendant, even suggests the contrary or amounts to holding that disclosure of some specific items of unreported income in a Bill of Particulars prevents the Government from employing thereafter a bank deposit, a net worth, or some other additional theory of proof, which it has in no sense renounced, as part of its case.

■■ It is also clear that the Government's employment here of the so-called "bank deposit theory" of proof of unreported income was correctly applied without any violence to defendant's rights. The plan of proving the existence of a business and the practice of making of deposits of business income into a bank account or accounts, and then adjusting total deposits thereto to avoid inclusion of transfer, redeposits, deposits otherwise explained, etc., and giving credit for ascertainable expenses, deductions and exemptions, has been long recognized. Morrison v. United States, 4 Cir., 270 F.2d 1, *cert. den.* 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 150; Gleckman

v. United States, 8 Cir., 80 F.2d 394, *cert. den.* 297 U.S. 709, 56 S.Ct. 501, 80 L.Ed. 996. The law is likewise clear that, once the Government proves unreported receipts having the appearance of income, and gives the defendant credit for the deductions he claimed on his return, as well as any others it can calculate without his assistance, the burden is on the defendant to explain the receipts, if not reportable income, and to prove any further allowable deductions not previously claimed. United States v. Hornstein, 7 Cir., 176 F.2d 217; United States v. Bender, 7 Cir., 218 F.2d 869, *cert. den.* 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253; Elwert v. United States, 9 Cir., 231 F.2d 928. The cases cited by defendant are not inconsistent with these principles and the trial court's instruction adopting these principles was thoroughly sound. The defendant here was not called upon to come forward with evidence to rebut a presumption as proscribed in Barrett v. United States, 5 Cir., 322 F.2d 292, but had the opportunity to prove any additional allowable deductions he might have had to offset proven income or to explain why what appeared to be income was not. Here it should be noted that almost two-thirds of the income charged to defendant was, in fact, proved by the specific-item method. It should be noted also, as the Government points out, that *Barrett* was reversed by the Supreme Court *sub nom.* United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L. Ed.2d 658, and hence is depreciated as persuasive authority.

■ Defendant argues as a paramount point that he was compelled to testify in violation of his constitutional right not to do so. This point is completely without merit, especially when viewed in relation to his completely voluntary and unsworn "testimony" while handling his own defense throughout the trial. As such, he told his life story, as well as his whole defense that he had no profit from his law practice, in his opening statement to the jury, frequently promising the judge to prove his statements by evidence later. This was not done to any substantial degree, but there is no question on this record that the jury had the benefit of defendant's theory of defense and assertions of the "facts" from his viewpoint from his own lips, repeatedly, long before he took the stand. In his examination and cross-examination of witnesses, defendant also frequently "testified" by unsworn statements purporting to be facts. This amounts to voluntary testimony and a waiver of the constitutional privilege not to testify. Redfield v. United States, 9 Cir., 315 F.2d 76. See, also, United States ex rel. Miller v. Follette, 2 Cir., 397 F.2d 363.

■ Defendant then took the stand as a witness when his wife was not permitted to testify about his checks which he had made out and collected for use as evidence of expenses. He identified the checks and testified as fully as he could about what they had been issued for as expenses of his law practice in 1960. The cross-examination of defendant, which he contends went beyond the scope of the direct testimony, was concerned with why the checks hadn't been produced before, how they could be directly related to his law practice, that they represented expenses actually borne by the clients, etc. Defendant's constitutional privilege was not asserted with respect to any question, and we do not believe that it was violated by questions on cross-examination here, nor do we believe that defendant was compelled to testify in any way by the Government or the trial court. His right not to testify did not destroy the large deposits proved by the Government nor permit him to offset them by incompetent evidence. The dilemma of permitting the Government evidence go unexplained and without offset, or attempting to offset it by his own testimony, which apparently was all he had, was no doubt a difficult choice, but it was clearly a choice available to the defendant. The fact that he chose to testify and his story didn't stand up very well before the jury, after cross-examination, is hardly a basis for reversal of his conviction.

Defendant's argument that exclusion of most of his cancelled checks from evidence denied him jury consideration of his defense is frivolous.

■ It is clear that most of them were excluded because no proper foundation had been laid to relate them to the case. All they tended to prove was that defendant spent this money in 1960, but this is vastly different from constituting evidence that such expenditures were proper offsets against his law practice revenue in the computation of taxable income for 1960. The record is clear that it would have been highly prejudicial to the Government to admit the checks which were excluded if the jury believed that they had probative value as proof of law business expenses to be off-set against the receipts proved. They had no such value without much more precise connection with the law practice through invoices, files, book records, etc., none of which was offered. The defendant simply cannot offer several hundred cancelled checks, claim they all represent his law business expenses, and have them admitted into evidence as such. The bulk of them were clearly properly excluded by the trial court on the Government's objection of no proper foundation. See Anderson v. United States, 8 Cir., 369 F.2d 11, *cert. den.* 386 U.S. 976, 87 S.Ct. 1171, 18 L.Ed.2d 136. Any lack of opportunity for the jury to consider the defense with regard to these checks was due to defendant's failure to relate them to the case under the rules of evidence.

Defendant's final argument that he was denied due process of law embraces six alleged errors of the trial judge during the trial.

■ The first is that the judge did not comply with Title 18 U.S.C. § 3500 (Jencks Act). As stated on page 28 of Defendant's Brief, after the IRS agent in charge of the case had stated on cross-examination that he had recommended criminal prosecution of defendant in a written report, defendant asked for production of that report. The court was advised by Government counsel that "any statements concerning the defendant" had been furnished,[4] and declined to order the production of the entire report which was represented by the Government to be "twenty-some volumes." The defendant objected stating, "I feel that I am entitled to all written memos by him regarding my case to the Internal Revenue, and why we are here today." Clearly, defendant sought more of the Government files than Jencks Act statements, and he made no request for an in camera inspection of the alleged twenty volumes or any part thereof. It is the Government's contention that such material did not constitute a "statement" under § 3500, and the two opinions of this court in United States v. Keig support that view. (See 334 F.2d 823, as well as 320 F.2d 634.) Where the Government has furnished what it believes are the required statements, and where the defendant's ostensible goal is to obtain the written recommendation of the witness rather than a factual statement, and especially in the absence of a clear motion or request that he do so, supported by reason, we do not conceive it the duty of the trial judge, under Title 18 U.S.C. § 3500, to peruse the entire multi-volume file or report of the "agent in charge" in a case such as this to determine what part or parts may relate to the subject matter of his testimony. Such accumulated file or overall report may not be assumed to be a "written statement" within the meaning of § 3500(e) (1) on any assumption that he has adopted it or the case wouldn't be in court. We hold that the action of the trial judge here did not violate his duty under the law relating to furnishing defendants with statements of Government witnesses.

■■ We find no merit whatsoever in defendant's contention that he was prejudiced because the Government

---

4. Pursuant to court order, this was done on the day before the Government witness testified, which goes beyond the require-ments of § 3500 for defendant's convenience (Tr. p. 96).

elicited evidence that he did not turn over his records or answer questions. He cites cases dealing with such proof in relation to the Fifth Amendment right not to testify which are wholly inapposite here in view of defendant's testimony as treated above. Likewise, we find no merit in defendant's suggestion that the court's sustaining of a Government objection to the question, "Does the Government, the Internal Revenue, have some kind of blacklist for anybody who may testify against them?", of a former Internal Revenue employee who said he was reluctant to testify without checking his position with regard to conflict of interest. The record makes abundantly clear that this question by defendant was objectionable as leading his own witness, and highly prejudicial as such. Defendant did not pursue the matter in any other manner at the trial, and it is hardly to be assumed that this witness or any other would have testified to any such "blacklist" when the word "list" was used only by defendant himself and the witness clearly explained that his own concern was simply possible conflict of interest.

■ Defendant's fourth alleged trial court error is the admission of Government summary sheets into evidence with caption "Total Net Unreported Income," which is called "irreparable prejudice." While the observation in Lloyd v. United States, 5 Cir., 226 F.2d 9, 17, cited by defendant is thoroughly sound, that such sheets should be factual and should not be encumbered unnecessarily with impressive conclusionary captions, it is noted that six such captions possibly so characterized in that case were held not to be reversible error. We do not think the captions here were any more conclusionary or impressive than required to make the summaries understandable. It is noted that they were amply justified. by the testimony which laid the foundation for their admission.

■ Defendant sought to impeach, through reputation evidence, a private lawyer who testified for the Government about his association with defendant.

Another lawyer, who said he knew them both, testified for defendant that defendant's reputation was good for "honesty, integrity, veracity," and was then asked by defendant, "If I asked you the very same questions regarding * * * (the government witness) * * *, what would your answers be?" The court sustained Government objection to the question, and defendant asserts here that this deprived him of the opportunity of impeaching a chief witness against him. Again defendant did not pursue the matter further at the trial, by other questions or otherwise; and it is apparent that the trial court's ruling was correct on the one question asked because "the very same questions" could not be applied to someone else with intelligible results. On its face it is more than one question, and what it embraces by way of knowledge of the witness concerning the reputation of the other person, place of residence of the other person, etc., is incomprehensible. Defendant's failure to follow up with other efforts to make the point cannot render improper a proper ruling by the trial judge. This is true, even assuming, as defendant argues, that he should have been permitted to elicit reputation evidence by way of impeachment of a Government witness. We do not need to decide that question in this context, and we do not decide it, because the trial court simply did not deny defendant such an opportunity by a proper ruling on objection to one clearly improper question.

■ Defendant's final point is that plain error resulted from a question by Government counsel on cross-examination of one of defendant's reputation witnesses whether he had heard of defendant's indictment for grand theft at a time which was five months after the indictment in this case. The trial judge sustained defendant's objection to the question, it was not answered by the witness, and, on defendant's request, the judge instructed the jury to disregard the question. Defendant did not ask for a mistrial at the time, but argues now that he was so unfairly prejudiced by the

question in the eyes of the jury as to have required a mistrial and here to require reversal for a new trial. It is argued that this is especially true in view of the testimony of one of defendant's clients who testified that he had not been informed by defendant of, or received the proceeds of, a case settlement. We do not agree.

It appears that the client mentioned was called by the Government to prove specific income to defendant in 1960, as were other clients, either in person or by stipulated testimony. The client testified that he did not know about or receive his share of his case settlement, but on cross-examination that impression was corrected when defendant produced a letter from himself to his client reporting settlement and offering distribution, which letter had been returned to defendant by the post office marked "Unclaimed." This must certainly also have tended to discredit other statements by the witness concerning defendant's failure to keep him informed.

Regardless of whether the question concerning subsequent indictment was proper or not, as the Government argues it was on the basis of Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168, this court has held, even where a motion for mistrial was made and denied by the trial court, that where there is also clear evidence of defendant's guilt, prompt action by the trial court in striking and instructing the jury to disregard prejudicial testimony of a post-arrest statement by defendant precludes reversal, which would have to be based on an assumption that the jury decided the case on evidence which was stricken rather than the sound evidence before it. United States v. Becera-Soto, 7 Cir., 387 F.2d 792, *cert. den.* 391 U.S. 928, 88 S.Ct. 1819, 20 L.Ed. 2d 669. Assuming that the question would be prejudicial if allowed to stand without proper limiting instruction to the jury, there is ample evidence here that defendant wilfully failed to report substantial income for the year 1960, the trial court did promptly instruct the jury

to disregard the question objected to, which was not answered, defendant made no motion for a mistrial at the time, and there appears less basis here than in *Becera-Soto* to assume that the unanswered question could have affected the jury verdict sufficiently to justify reversal.

The cases cited by defendant on this point are inapposite in that they all involve actual testimony or other evidence which was not stricken.

We have found no error in this record in any wise sufficient to justify reversal of the judgment of conviction.

It is accordingly affirmed.