**UNITED STATES of America, Appellee,**

v.

**Ben J. SLUTSKY and Julius Slutsky, d/b/a "The Nevele", Appellants.**

**Nos. 1037, 1038, Dockets 73–1549, 73–1550.**

United States Court of Appeals, Second Circuit.

Argued June 25, 1973.

Decided Sept. 24, 1973.

---

See also D.C., 352 F.Supp. 1105.

———◆———

Louis Bender, New York City (Sandor Frankel, New York City, on the brief), for appellant Ben J. Slutsky.

William Esbitt, New York City (Edward Brodsky and Edwin L. Schwartz, New York City, on the brief), for appellant Julius Slutsky.

John J. Tigue, Jr., Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., Robert P. Walton and John W. Nields, Jr., Asst. U. S. Attys., New York City, on the brief), for appellee.

Before LUMBARD, HAYS and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Ben J. Slutsky and Julius Slutsky appeal from judgments of conviction entered upon jury verdicts returned January 9, 1973 after a six day trial before Lloyd F. MacMahon, *District Judge*, in the Southern District of New York. Each appellant was found guilty on three counts of attempted personal income tax evasion, in violation of 26 U.S.C. § 7201 (1970). In addition, Ben J.

Slutsky was found guilty on two counts, and Julius Slutsky on one count, of signing and filing false partnership income tax returns, in violation of 26 U.S.C. § 7206(1) (1970). On March 19, 1973, a sentence of five years imprisonment and a $40,000 fine was imposed on Ben J. Slutsky, and a sentence of five years imprisonment and a $35,000 fine was imposed on Julius Slutsky. The costs of prosecution were imposed on each appellant. Each has been released on his own recognizance pending appeal.

Of the numerous claims of error raised on appeal, we find the principal issues to be those relating to the sufficiency of the evidence adduced by the government under the "bank deposits" method of proof and the propriety of sentencing appellants for violations of both 26 U.S.C. § 7201 and 26 U.S.C. § 7206(1).

We affirm the judgments of conviction as to both appellants on the tax evasion counts (Counts 4, 5, 6, 7, 8 and 9); but we reverse and vacate the judgments of conviction and cumulative sentences imposed upon both appellants on the false filing counts (Counts 1, 2 and 3) as an improper pyramiding of penalties.

I.

FACTS

Viewing the evidence in the light most favorable to the government, as we must at this stage, United States v. McCarthy, 473 F.2d 300, 302 (2 Cir. 1972), the jury could have found the facts as follows.

Appellants were the equal and only partners in the Nevele, a large, successful resort hotel located at Ellenville, New York, in the Catskill Mountains. During the years in question appellants were engaged full time in the management of the Nevele.

In 1967, the IRS commenced a routine audit of the Nevele's books. At first it was directed at the taxable years 1964 and 1965. Later it was extended to in-

clude 1966 and 1967.[1] The audit, conducted chiefly by Agent Vera Wood, led to the conclusion by the IRS that the tax returns filed by appellants for the years in question had failed to include substantial income sums attributable to the partnership.

Agent Wood's suspicions initially were aroused when, in checking the books of the Golden Gate Hotel,[2] she discovered an "exchange" transaction entry indicating that the Nevele had satisfied a $136,000 mortgage obligation of the Golden Gate. Recalling no record of any such exchange in the Nevele's books, Agent Wood asked Samuel Levis (the Nevele accountant), John Greco (the full-time bookkeeper), and Ben Slutsky to explain both the accounting treatment of the transaction on the Nevele's books and the source of the sum involved. After a series of unsatisfactory responses by Slutsky, Levis presented to Agent Wood a copy of a bank ledger card for a savings account in the name of Ben or Julius Slutsky. This showed a withdrawal in the amount of $136,000. Agent Wood then confirmed that this savings account was reflected nowhere in the Nevele books. She found, on a rough addition of the amounts in that account and those properly recorded, "that the total of these deposits exceeded the cash that was available as reflected in the cash on hand account of the books".

Appellants first maintained that all of the sums deposited in the savings account had been recorded on the Nevele's books as income. Later they asserted that the deposits did not represent income at all but were advance reservation deposits which were held in escrow until the guests arrived at the Nevele and income actually began to accrue.

Agent Wood then intensified her audit. She discovered two additional unrecorded bank accounts under the control of appellants. At this point, the analysis focused on the following six accounts:

(A) Accounts on Nevele books:
　(1) Checking account in name of "The Nevele", at Sullivan County National Bank;
　(2) Checking account in name of "The Nevele", at First National Bank and Trust Company of Ellenville;
　(3) Checking account in name of "The Nevele", at Ellenville National Bank;
(B) Accounts not on Nevele books:
　(4) Savings accounts in name of "Ben or Julius Slutsky", at Ellenville National Bank;
　(5) Checking account in name of "Julius or Alice Slutsky", at Ellenville National Bank;
　(6) Checking account in name of "Alice Slutsky", at Ellenville National Bank.

Upon appellants' continued failure satisfactorily to explain the excess of deposits over recorded income, Agent Wood filed a report. The case was referred to the Intelligence Division of the IRS.

The referral culminated in a thorough investigation headed by Special Agent David Empie. This investigation utilized the "bank deposits method". This involves an analysis of all deposits made in bank accounts under the control of the taxpayer, the total of which is adjusted to exclude transfers, loans, redeposits, and other identifiable non-income items. Further subtractions are made for allowable exemptions and deductions. The resulting net taxable income figure is compared against the

---

1. The ensuing indictment, returned November 2, 1972, charged violations only with respect to the taxable years 1965–67. Alleged violations during the year 1964 were not included because of the running of the applicable statute of limitations.

2. The Golden Gate Hotel was a separate partnership of appellants, the income of which was not involved in the instant indictment.

total taxable income reported.[3] As summarized by the government at trial, the investigation produced the following data in support of the alleged unreported income for each of the three tax years involved:

Ben J. Slutsky et al.

Schedule of Alleged Unreported Income—Nevele

1965, 1966, 1967

| Item | Particulars | 1965 | 1966 | 1967 |
|---|---|---|---|---|
| 1 | Total Bank Deposits | $6,548,213.68 | $5,287,062.46 | $6,310,260.18 |
| 2 | Less: Nonincome Deposits and Items | 3,283,910.71 | 998,361.76 | 1,707,471.99 |
| 3 | Gross Receipts—Bank Deposit Method | 3,264,302.97 | 4,288,700.70 | 4,602,788.19 |
| 4 | Cash-on-hand Less: Balance—beginning of year | 78,688.84 | 193,346.46 | 206,772.39 |
| | Sub-Total | 3,185,614.13 | 4,095,354.24 | 4,396,015.80 |
| | Add: Balance—end of year | 193,346.46 | 206,772.39 | unknown |
| 5 | Gross Receipts—Bank Deposit Method (adjusted) | 3,378,960.59 | 4,302,126.63 | 4,396,015.80 |
| 6 | Less: Direct Costs claimed on returns | 2,146,562.42 | 2,746,645.27 | 2,771,463.63 |
| 7 | Gross Profit | 1,232,398.17 | 1,555,481.36 | 1,624,552.17 |
| 8 | Less: Other expenses and depreciation claimed on returns | 976,988.28 | 966,183.80 | 1,181,760.18 |
| 9 | Partnership ordinary income as corrected | 255,409.89 | 589,297.56 | 442,791.99 |
| 10 | Partnership ordinary income as reported | ( 143,767.32) | 111,387.09 | 87,816.67 |
| 11 | Unreported Income | $ 399,177.21 | $ 477,910.47 | $ 354,975.32 |

The tax effect of the unreported income set forth in this summary was to increase the partnership share of each appellant by $199,588.60 for 1965; $238,955.23 for 1966; and $177,487.66 for 1967. This resulted in a total alleged personal tax deficiency for the three years involved of $369,136.83 for Julius Slutsky and of $391,945.19 for Ben Slutsky.

A nine count indictment was returned November 2, 1972.[4] At trial, the government claimed that the large deficiencies stated above were the result of wilful fraud. In support of that theory, the government adduced evidence de-

3. This method of analysis necessarily closely tracks the requirements of trial proof which we discuss in greater detail later in this opinion under Section III(A). See, e. g., United States v. Lacob, 416 F.2d 756, 759 (7 Cir. 1969), cert. denied, 396 U.S. 1059 (1970).

4. Count 1 charged Julius Slutsky with making and subscribing to a false partnership income return for the year 1965. Counts 2 and 3 charged Ben Slutsky with making and subscribing to false partnership income returns for the years 1966 and 1967. Counts 4, 5 and 6 charged Julius Slutsky with wilfully attempting to evade personal income taxes for the years 1965, 1966 and 1967. Counts 7, 8 and 9 charged Ben Slutsky with wilfully attempting to evade personal income taxes for the years 1965, 1966 and 1967.

scribing the Nevele's bookkeeping and accounting procedures. Ideally, all guest charges—the basic form of the Nevele's income—would be recorded as received in a "bill book". At the end of each day, Julius Slutsky would reconcile the bill book with the physical cash received. He personally prepared the deposit slips. An adding machine tape showing the total would then be given to Greco, the bookkeeper, who thereafter would post the receipts in a cash on hand account in the Nevele's books. As the receipts were deposited in one or more of the bank accounts, or otherwise disbursed, the disposition of the funds presumably would be posted accordingly—i. e., by crediting the cash on hand account and debiting the appropriate disbursal account. The government's evidence showed, however, that with respect to bank deposits only those deposits in one of the three accounts in the name of the Nevele were properly recorded.

The government's essential claim was that the unrecorded accounts served to mask large sums of money which constituted income to the partnership. The evidence showed that, while the cash on hand account was the principal stage at which the fraud was committed, the internal accuracy of that bookkeeping account nevertheless was preserved by a system of parallel entries. Thus, certain cash receipts deposited in the recorded accounts would not be posted in the cash on hand account; but subsequent deposits in the unrecorded accounts, in corresponding amounts, were duly noted in the cash on hand account. This, according to the government's evidence, resulted in appellants purporting to show that the amounts deposited in the unrecorded accounts had been properly recorded as income.[5]

Appellants, on the other hand, while admitting the irregularities in the treat-

ment of deposits in the unrecorded accounts, vigorously disclaimed the inference of fraud urged by the government. They contended that there was no evidence of any receipts not recorded as income in the cash on hand account and that, by charging as income the deposits in the personal accounts *plus* the total in the cash on hand account, the government had computed over $1 million in receipts twice, thus creating the alleged deficiency. Moreover, appellants argued that the government's own proof demonstrated the built-in inaccuracy in the cash on hand account which resulted in computations known by the government to be in error throughout.

The remainder of the evidence, particularly that bearing on the bases for the government's computations and the details of the cash on hand account, we discuss later in this opinion in connection with our consideration of the sufficiency of the evidence. The case was submitted to the jury on the bank deposits method. The jury found appellants guilty on all counts. This appeal followed.

## II.

### VENUE

Before turning to the sufficiency of the evidence, we shall consider a preliminary question raised by appellants: whether the district court erred in denying appellants' pretrial motion to dismiss for improper venue. The claim is that, while the returns involved in the instant indictment were prepared and signed in the Southern District of New York, they were filed at the IRS Regional Center at Albany in the Northern District of New York. Appellants contend that, since the offenses charged were not "committed" within the meaning of Fed.R.Crim.P. 18[6] until the re-

---

5. This apparently is what confronted Agent Wood upon her initial discovery of the unrecorded accounts. According to her trial testimony, "[A]t that point it appeared that our review of the cash of the bill books and the deposits that were being recorded in the

cash receipts book that at that point that this money had gone into income."

6. Fed.R.Crim.P. 18 provides:
 "Except as otherwise permitted by statute or by these rules, the prosecution

turns were filed at Albany, the prosecution should have been in the Northern District.

We disagree.

With respect to counts 1–3 charging appellants with making and subscribing to false partnership returns in violation of 26 U.S.C. § 7206(1), the law in this Circuit is settled that venue properly lies where a false statement is prepared and signed, even though received and filed elsewhere, by operation of the "continuing offense" statute.[7] See, e. g., United States v. Miller, 246 F.2d 486, 487–88 (2 Cir.), cert. denied, 355 U.S. 905 (1957). This is consonant with the view that the "statutory key verbs" control in determining venue. See United States v. Hagan, 306 F.Supp. 620, 621–22 (D.Md.1969) (Thomsen, Chief Judge). Here, the key words in the statute are "makes and subscribes" a false return—acts charged as having been done in the Southern District of New York. Venue accordingly was proper in that district.

We reach the same conclusion with respect to counts 4–9 charging wilful attempts to evade taxes in violation of 26 U.S.C. § 7201. In United States v. Gross, 276 F.2d 816, 818 (2 Cir.), cert. denied, 363 U.S. 831 (1960), relying

upon the continuing offense doctrine, we held that venue was proper in the district in which the returns forming the basis of the tax evasion charge had been prepared, even though they were signed and filed elsewhere.

That rationale is of equal force here.[8] In addition to the preparation of the returns in the Southern District, appellants signed them there. That provides a further significant contact and reinforces the *Gross* analysis. Moreover, while the indictment charged appellants with filing false returns, the offense here under consideration was the wilful attempt to evade their tax obligations. Under 18 U.S.C. § 3237(a), venue will lie wherever the attempt to evade taxes was begun, continued, or completed.

We hold that the preparing and subscribing of the returns in the Southern District made venue in that district proper.[9]

### III.

## SUFFICIENCY OF THE EVIDENCE

### (A) ADEQUACY OF INVESTIGATION

In utilizing the bank deposits method of proof, the government necessarily relied on circumstantial evidence. United

---

shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses."

7. 18 U.S.C. § 3237(a) (1970) provides:
 "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.
 Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves."

8. Travis v. United States, 364 U.S. 631 (1961), is not to the contrary. While that

case held that the alleged violation of 18 U.S.C. § 1001 (making false statement) could be prosecuted only in the districts in which the affidavits had been filed, the decision surely was meant to be confined to the facts based on the unusual statute involved.

9. We further note the absence of any prejudice to appellants as the result of venue in the Southern District. Appellants do not claim that the prosecution there rather than in the Northern District created any difficulty in obtaining witnesses or documents, or indeed that any additional expense was incurred. Further, under 18 U.S.C. § 3237 (b), a person charged with violations of 26 U.S.C. §§ 7201 and 7206(1) may "elect to be tried in the district in which he was residing at the time the alleged offense was committed." In this case, that was the Southern District. We surmise that by bringing the action in the Southern District in the first instance the government avoided a likely motion to transfer under Section 3237(b).

States v. Doyle, 234 F.2d 788, 793 (7 Cir.), cert. denied, 352 U.S. 893 (1956). That imposes on us in reviewing the convictions below the duty of "bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method [as with the 'net worth' method] that is itself only an approximation." Holland v. United States, 348 U.S. 121, 129 (1954). In the context of this case, we direct our attention particularly to the adequacy of the foundation underlying the computations introduced by the government and the propriety of the investigation that led to those computations. We hold that the bank deposits method of proof in this case complied with the requirements of law and adequately supported the jury verdicts that resulted.

■■ The requirement of a full and adequate investigation in a bank deposits case is based on the similar requirement in a net worth case. Holland v. United States, *supra.* Such investigation must establish a guarantee of essential accuracy in the circumstantial proof at trial as an element of the government's burden of proving guilt beyond a reasonable doubt. Kirsch v. United States, 174 F.2d 595, 601 (8 Cir. 1949). Once the government satisfies its burden of proving substantial deposits in excess of reported income, has given the taxpayer credit for properly claimed and otherwise allowable deductions, and shows that it has taken all reasonable steps to eliminate identifiable non-income items, the burden is then on the taxpayer to explain the remaining excess. United States v. Lacob, 416 F.2d 756, 760 (7 Cir. 1969), cert. denied, 396 U.S. 1059 (1970).

Having these requirements in mind, we must examine the adequacy of the government's investigation. The record shows that, as a result of the IRS' examination of the six bank accounts with-

in appellants' control, it made the following analysis:

1. *Checking account in name of "The Nevele" at Sullivan County National Bank.*

 With the exception of two unidentified items totalling some $2,000, every item of the total $1,661,639.08 deposited in this account during the three taxable years was analyzed. More than $1.5 million was identified as non-income. The remainder was charged as income.

2. *Checking account in name of "The Nevele" at First National Bank and Trust Company of Ellenville.*

 Of the total $1,710,083.34 deposited in this account, more than $550,000 was identified as income to the Nevele. That figure comprised 788 individual items of which 678 were items under $1,000. The IRS' investigation of this account entailed an analysis of every item over $1,000 (with the exception of approximately $11,000), and a random analysis of items under $1,000. Only $13,456.78 of the total deposits was identified and eliminated as non-income.

3. *Checking account in name of "The Nevele" at Ellenville National Bank.*

 In this, the major business account, more than $13 million was deposited during the three years in question. Of the items over $1,000, the IRS analyzed all but $4,000. In addition, of the items under $1,000 (all of which had a number encircled on the back of the checks),[10] some 769 were randomly analyzed. The result was the elimination of almost $3.8 million as non-income, the identification of over $800,000 as income, and the further charging as income of almost $7.5 million in un-

---

10. Irving Greene, the Nevele's front office manager, testified that a cashier, upon receiving a check from a guest leaving the ho-
tel, was instructed to write the guest's room number on the back of the check and encircle that number.

identified items under $1,000. Some $1 million in currency deposited in this account was also charged as income.

4. *Savings account in name of "Ben or Julius Slutsky" at Ellenville National Bank.*

 Of the total $996,297.82 deposited in this account, every item was identified. $19,500 was eliminated as non-income. The remainder was charged as income.

5. *Checking account in name of "Julius or Alice Slutsky" at Ellenville National Bank.*

 Of the total $326,687.75 deposited in this account, every item was identified. More than $230,000 was eliminated as non-income. The remainder was charged as income.

6. *Checking account in name of "Alice Slutsky" at Ellenville National Bank.*

 Of the total $360,929.44 deposited in this account, every item was identified. More than $170,000 was eliminated as non-income. The remainder was charged as income.

In sum, of approximately $18 million in total deposits during the three years involved, more than $5.7 million was eliminated as non-income,[11] and the remainder was charged as gross income for purposes of the bank deposits analysis. Of the total charged as income, almost $2.8 million was in specifically identified items. Almost $8.6 million, however, was in unidentified items, and a further $1 million was in currency. Appellants' principal attack on the sufficiency of the government's investigation focuses on this large sum of unidentified checks and currency charged as income.

■ ■ The adequacy of a bank deposits investigation necessarily turns on its own circumstances. The reported cases indicate the kinds of factors that bear on the assessment of adequacy. The critical question is whether the government's investigation has been sufficiently adequate to support the inference that the unexplained excess in receipts was in fact attributable to currently taxable income. Holland v. United States, *supra*, 348 U.S. at 137. In proving its case, the government is not required to negate all possible non-income sources of the deposits, particularly where the source of the income is uniquely within the knowledge of the taxpayer. At the same time, however, the government may not "disregard explanations of the defendant reasonably susceptible of being checked". *Id.* at 138.

Thus, in United States v. Lacob, *supra*, the court upheld as adequate an investigation involving total deposits of $99,000 by a lawyer who specialized in personal injury claims with fees ranging from 20% to 33⅓%. There, "[o]f $39,356.33 of substantial checks deposited but not identified or explained, defendant was charged with income of $7,871.27, or 20%, because it was assumed, in the absence of other proof, that these were proceeds of cases. . . ." 416 F.2d at 758. Similarly, in United States v. Procario, 356 F.2d 614 (2 Cir.), cert. denied, 384 U.S. 1002 (1966), where almost half of the total alleged professional receipts were in the form of deposits unidentified by the government, we said:

"The government relied on the fact that it excluded all possible dividends, on the small size and relative frequency of the deposits, similar to deposits and other income proven to be professional receipts, and on the fact that appellant had patients other than those whose payments were included in . . . the directly proven items of income. This was sufficient." 356 F.2d at 618.

■ We hold that the government's investigation here was clearly sufficient

---

11. In addition to the $5.7 million eliminated as the result of the government's own investigation, some $180,000 attributed to "leads" and $47,000 attributed to "guest returns" were also eliminated.

under the particular circumstances of the case.[12] Analysis of the nature of the business in which appellants were engaged revealed that most income items were in amounts under $1,000. Accordingly, the investigation included a detailed check of every item in an amount greater than $1,000, with very few specified exceptions. In addition, a random check of 1447 items in amounts less than $1,000 was made; and the analyzed items were found to constitute income in virtually every instance. Moreover, a further examination of the business accounts disclosed that almost every item in an amount under $1,000 was reflected by a check with a room number encircled on the back; according to the record, this specifically identified these items as guest receipts and therefore income. To hold the government to a stricter duty of investigation than it performed here would be to ignore both the "reasonableness" and "fairness" strictures that have been imposed; it would also result in an exercise in diminishing returns in terms both of the provision of relevant information to the fact-finder and of the protection of the rights of taxpayers.

 Appellants' attack upon the sufficiency of the government's investigation appears further to have misconstrued the essence of the bank deposits method of proof. "[O]nce the Government proves unreported receipts having the appearance of income, and gives the defendant credit for the deductions he claimed on his return, as well as any others it can calculate without his assistance, *the burden is on the defendant to explain the receipts, if not reportable income,* and to prove any further allowable deductions not previously claimed." United States v. Lacob, *supra,* 416 F.2d at 760. (emphasis added). Put another

way, once the existence of unreported receipts is established, "the defendant remains quiet at his peril." Holland v. United States, *supra,* 348 U.S. at 139. Proof of the exact amount of the understatement is not required, United States v. Johnson, 319 U.S. 503, 517 (1934); United States v. Pawlak, 352 F.Supp. 794, 796 (S.D.N.Y.1972), nor is there any duty to negate all non-income sources of unreported receipts. United States v. Doyle, *supra,* 234 F.2d at 794. Once the government showed that appellants' accounting system was such as to permit the non-disclosure of income, as well as the existence of substantial amounts of excess deposits which, after reasonable investigation, had the appearance of income, that was sufficient to warrant submitting the case to the jury.

We hold that the government adequately sustained its burden in this case.

(B) OPENING CASH ON HAND

 ██ As in a net worth case, Holland v. United States, *supra,* 348 U.S. at 132–35, an essential element of the government's burden of proof in a bank deposits case is to establish an accurate cash on hand figure for the beginning of the taxable year. If the taxpayer's deposits or other expenditures during the relevant year "came from a safety deposit box in a bank or from a hoard at home, obviously they are not 'income' when taken from their storage place and deposited in a checking account nor when spent." United States v. Frank, 245 F.2d 284, 287 (3 Cir.), cert. denied, 355 U.S. 819 (1957). Thus, the government must prove with reasonable certainty the amount of undeposited cash at the beginning of the year so that an appropriate amount may be subtracted from the total of deposits made during the taxable year.[13]

---

12. Appellants' contention to the contrary is undermined to a significant degree by the testimony of Nathan Frankel, an accountant who conducted a two year investigation of appellants' books after being retained by appellants. Frankel testified that he discovered even fewer non-income items than had the government. And significantly he did

not check *any* of the reported accounts despite assistance by a staff of eight.

13. By the same token, the cash on hand at the *end* of the taxable year must be added to the sum of deposits to reflect the total income for that year. That procedure was followed by the government in this case.

In the instant case, the government alleged cash on hand at the beginning of 1965 of $78,688.84, a figure taken directly from the Nevele's general ledger. Appellants mount a two-tiered attack on that figure. First, they contend that the government's own proof demonstrated the inaccuracy of the cash on hand account in the Nevele's books—the source of the figure used—and that therefore the proper foundation for the resulting computation is lacking. Second, they argue that the government was informed by appellants of the source of the inaccuracy and that the failure to utilize that information violated the "leads" doctrine of *Holland*.[14] We hold that the record supports the use of the opening figure relied on by the government.

Appellants' essential contention is that the evidence showed the inherent unreliability of the cash on hand account in that the account was not properly credited when deposits were made in any of the three accounts not recorded in the Nevele's books. This resulted, according to appellants, in a double computation of large sums of money: once in the sum of deposits in those accounts and again in the use of the cash on hand account itself as an index of receipts. Whatever merit there might be in this contention if the government had relied solely on the figure in the cash on hand account to establish an opening cash on hand amount, the record clearly demonstrates sufficient corroboration to have warranted submission of the case to the jury.

First, as stated above, the proof adduced by the government which showed the manner in which appellants were able to conceal substantial sums of income alleged to have been unreported was sufficient to demonstrate that the integrity of the cash on hand account was maintained despite its use in the fraudulent scheme. Second, and of critical importance, independent evidence was introduced by which the validity of the figure shown in the cash on hand account could be tested. Specifically, the government demonstrated that in each of the years in question the deposits in the two principal business accounts during the first few days of the new year were consistent with the amount of cash indicated in the ledger account. And, finally, the cash on hand account figure was authenticated by the in-house investigation conducted by Nathan Frankel, an accountant retained by appellants subsequent to the commencement of the IRS audit. Frankel, it should be noted, had the additional benefit of full access to all of the Nevele's books and records, a privilege not afforded the government.[15]

Accordingly, apart from making the opening cash on hand figure sufficiently reliable to allow the jury to consider the evidence, the factors enumerated above more than adequately negate appellants' contention that the government failed to follow up leads provided by appellants. The "leads" doctrine, as outlined in Holland v. United States, *supra*, 348 U.S. at 135–36, places on the government a duty of "effective negation of reasonable explanations by the taxpayer inconsistent with guilt"—a duty limited to the investigation of "leads reasonably susceptible of being checked which, if true, would establish the taxpayer's innocence." Here, the leads furnished by appellants, such as they were, were not directed as much

---

14. At one time there was some doubt as to the applicability of the "leads" doctrine to a bank deposits case. In United States v. Procario, 356 F.2d 614, 617 (2 Cir.), cert. denied, 384 U.S. 1002 (1966), for example, we noted the argument but found no need to resolve it upon the facts of that case. The contention that the "leads" doctrine should be confined to a net worth case is no longer tenable. See, e. g., United States v. Rams-

dell, 450 F.2d 130, 133 (10 Cir. 1971); United States v. Stein, 437 F.2d 775, 778 (7 Cir.), cert. denied, 403 U.S. 905 (1971).

15. The government's pre-trial motion to require production of the books was denied on the ground of appellants' privilege against self-incrimination. United States v. Slutsky, 352 F.Supp. 1105, 1108 (S.D.N.Y.1972).

at the inaccuracy of the cash on hand account as against the alleged invalidity of the government's entire theory of tax evasion. In every practical sense, the ensuing investigation, which we hold to have been full and fair, consisted of a "tracking down" of the explanations offered by appellants. The essence of the government's investigation was a detailed study of the use of the cash on hand account. This led to the conclusion, bolstered by independent evidence, that the explanation offered by appellants was untrue. To require the government to do more would be to ignore the element of reasonableness embodied in the "leads" doctrine.

█ We hold that the government fully discharged its duty to investigate the leads furnished by the taxpayers, and that the resulting evidence was sufficient to establish with reasonable certainty the accuracy of the cash on hand figure used.

### (C) WILFULNESS

Appellants also challenge the sufficiency of the evidence of wilfulness. We hold that there was ample evidence to establish this essential element of the offenses charged.[16]

█ █ The government was required to establish beyond a reasonable doubt that appellants acted wilfully and knowingly with the specific intent to evade their income tax obligations. United States v. Coblentz, 453 F.2d 503, 505 (2 Cir.), cert. denied, 406 U.S. 917 (1972). That means proof of a conscious, deliberate, purposeful act or omission, as opposed to an unconscious, unwilling, negligent or mistaken one. United States v. Platt, 435 F.2d 789, 793–94 (2 Cir. 1970) (§ 7203 violation); United States v. Berger, 325 F.Supp. 1297, 1303 (S.D.N.Y.1971), aff'd, 456 F.2d 1349 (2 Cir.), cert. denied, 409 U.S. 892 (1972). It was further incumbent upon the government to establish intent by evi-

dence independent of the understatement of income. Holland v. United States, *supra*, 348 U.S. at 139.

█ The proof of wilfulness in this case was clearly sufficient. In the evidence from which the jury was entitled to find intent to evade taxes was the consistent pattern of understating substantial sums of income, Holland v. United States, *supra*, 348 U.S. at 139; the withholding of material information from Levis, appellants' own accountant, United States v. Procario, *supra*, 356 F. 2d at 618; the withholding of material information from Agent Wood of the IRS, United States v. Rischard, 471 F.2d 105, 108–09 (8 Cir. 1973); and the resort to unorthodox accounting practices, including parallel entries, with deceptive results. United States v. Waller, 468 F. 2d 327, 329 (5 Cir. 1972), cert. denied, 410 U.S. 927 (1973). See also Spies v. United States, 317 U.S. 492, 499 (1943).

In short, the independent evidence of intent, aside from the fact of understatement, was sufficient to support the jury's verdict.

### IV.

### SENTENCE

█ Appellants argue that, even if the proof was sufficient to support the guilty verdicts, the court erred in imposing cumulative sentences under Sections 7201 and 7206(1). We agree. Accordingly, we vacate the convictions and sentences imposed upon both appellants on the false filing counts (Counts 1, 2 and 3) which charged violations of Section 7206(1).

In United States v. White, 417 F.2d 89 (2 Cir. 1969), cert. denied, 397 U.S. 912 (1970), defendants similarly had been charged with violations of both Sections 7201 and 7206(1). Following the return of guilty verdicts under both sections, maximum cumulative fines were imposed on all counts. We re-

---

16. The burden of proof on the element of intent is similar for prosecutions under both Sections 7201 and 7206(1). See generally,

United States v. Bishop, 412 U.S. 346, 356 (1973).

versed, saying that "the cumulative fines, insofar as they exceeded the maximum possible fine under the greater offense charged in § 7201, constituted an unauthorized pyramiding of penalties." 417 F.2d at 93. That view was premised on Sansone v. United States, 380 U.S. 343, 349 (1965), where the Supreme Court held that Sections 7203 and 7207 are lesser-included offenses within Section 7201 in an appropriate case. Likewise, we held in *White* that "where proof of wilfully attempted evasion under § 7201 also proves, as an incident to the wilful evasion, the preparing and subscribing of a fraudulent return [under Section 7206(1)], the specific form of fraudulent conduct merges into the inclusive fraud under § 7201", thereby rendering improper a cumulation of penalties beyond the maximum authorized by Section 7201. 417 F.2d at 94.

The government argues that *White* does not control here because in *White* the indictment involved only individual returns, whereas here the respective counts charge independent violations of individual and partnership returns. Unlike the unitary circumstances in *White*, the government urges, "[s]igning a false partnership return (§ 7206(1)) is not a lesser included offense of personal tax evasion (§ 7201) because . . . the essential elements of each crime are different and each offense can be committed without committing the other."

The government's argument overlooks, however, the nature of a partnership return.[17] A partnership, unlike a corporation, is not in itself a taxable entity.

The partners alone are liable as individuals for the income from their respective partnership shares, computed in addition to any other individual income. Commissioner v. Whitney, 169 F.2d 562, 564–65 (2 Cir.), cert. denied, 335 U.S. 892 (1948). The partnership returns, while required under the tax laws, are information returns only. 26 U.S.C. § 6031 (1970). Equally important for present purposes, the offense of signing and filing a false partnership return is limited to the specific partner charged with those acts; neither the partnership nor the other co-partners are subject to punishment by reason of such offense. In short, we see no justification for treating the contemporaneous filing of a false partnership information return and a false individual return any differently from the filing of a false individual return alone. In each instance, where an indictment charges both tax evasion under Section 7201 and perjury under Section 7206(1), and the evidence at trial proves the latter as an incident of the former, "the specific form of fraudulent conduct [perjury] merges into the inclusive fraud charged under § 7201." United States v. White, *supra*, 417 F.2d at 94.

We therefore hold that the cumulation of penalties beyond the maximum authorized by Section 7201 is improper. The convictions of appellants on Counts 1, 2 and 3, charging the signing and filing of false partnership returns in violation of Section 7206(1), and the sentences imposed thereon, accordingly are reversed and vacated.[18]

17. That the district court itself recognized the personal, as opposed to corporate, characteristics of this particular partnership is evident from its denial of the government's pre-trial motion to produce the partnership's records on the ground that the privilege against self-incrimination was held applicable. "Rather than an impersonal and detached business owned by absentees with all the aspects of a corporation, the Nevele hotel appears to be a personal family business, albeit large and successful." United States v. Slutsky, 352 F.Supp. 1105, 1108 (S.D.N.Y. 1972).

18. There is some question as to the proper course that should follow our holding—i. e. whether we should vacate both the conviction and sentence on the improperly pyramided counts, or simply vacate the sentence imposed. In *White*, where fines and not prison terms were imposed, only the sentence was vacated. That procedure was criticized, however, in United States v. Rosenthal, 454 F.2d 1252, 1255 n. 2 (2 Cir.), cert. denied, 406 U.S. 931 (1972). There, noting the "collateral consequences of convictions", it was concluded that vacation of the conviction on the lesser count was also

We have carefully considered the other claims of error raised by appellants, including the various charges of prejudicial error in the conduct and timing of the trial. We find them wholly without merit.

We affirm the judgments of conviction as to both appellants on Counts 4 through 9. We reverse and vacate the judgments of conviction and cumulative sentences imposed upon both appellants on Counts 1 through 3.

required. We agree with that approach, viewing the "collateral consequences" as particularly troublesome in a lesser-included offense case where such characterization necessarily presumes that Congress did not intend two punishments for the same crime. See also United States v. Newman, 468 F.2d 791, 796 (5 Cir. 1972).

Here, as in *Rosenthal*, moreover, "[t]here is no occasion to remand for resentencing since it is plain that the conviction[s] on the lesser included offense[s] did not lead the judge to impose a heavier sentence on the [§ 7201 counts] than he otherwise would." 454 F.2d at 1256.

Appellant Ben J. Slutsky was sentenced to three year terms of imprisonment on each of counts 2 and 3 and to five year terms of imprisonment on each of counts 7, 8 and 9, all prison sentences to run concurrently; and he was fined $5,000 on each of counts 2 and 3, $10,000 on each of counts 7, 8 and 9, all fines being cumulative.

Appellant Julius Slutsky was sentenced to a three year term of imprisonment on count 1 and to five year terms of imprisonment on each of counts 4, 5 and 6, all prison sentences to run concurrently; and he was fined $5,000 on count 1, $10,000 on each of counts 4, 5 and 6, all fines being cumulative.

The net result of our vacating the convictions and sentences of both appellants on counts 1, 2 and 3 is that the remaining effective sentence for appellant Ben J. Slutsky is five years imprisonment and a $30,000 fine; that for appellant Julius Slutsky is five years imprisonment and a $30,000 fine.