PHYLLIS A. WOODALL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JEANNIE S. COUTTA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Woodall v. Commissioner
Docket Nos. 31937-87, 31938-37
United States Tax Court
T.C. Memo 1991-15; 1991 Tax Ct. Memo LEXIS 15; 61 T.C.M. (CCH) 1682; T.C.M. (RIA) 91015; January 17, 1991, Filed *15 Decisions will be entered under Rule 155. Towner Leeper and John Leeper, for the petitioners. William R. Leighton, for the respondent. FEATHERSTON, Judge. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income taxes, in identical amounts for each petitioner, as follows: Additions to Tax, I.R.C. Sections [1]
Year
Deficiency
6653(a)(1)
6661
1982
$ 747
$  37
-- 1983
16,780
839
$ 2,015
1984
9,506
475
-- Respondent also determined that each petitioner is liable for additions to tax under section 6653(a)(2), in amounts equal to 50 percent of the interest due on the following underpayments attributable to negligence: $ 255 for 1982, $ 8,060 for 1983, and $ 4,163 for 1984. The issues *16 for decision are: (1) whether the partnership in which petitioners were equal partners is entitled to deduct amounts, disallowed by respondent, for repairs, taxes, and depreciation; (2) whether the partnership is entitled to a fire loss deduction under section 165 greater than the amount allowed by respondent; (3) whether compensation received by the partnership for fire damage is nontaxable under the involuntary conversion provisions of section 1033; (4) whether respondent's use and specific application of the bank deposits and cash expenditures method of income reconstruction renders the notices of deficiency arbitrary and capricious; (5) whether respondent's income adjustments derived from the bank deposits and cash expenditures method are erroneous; and (6) whether petitioners are liable for section 6653(a) and section 6661 additions to tax. FINDINGS OF FACT Petitioners Phyllis A. Woodall and Jeannie S. Coutta were residents of El Paso, Texas, when their respective petitions were filed. For the years at issue, each timely filed her Federal income tax returns with the Internal Revenue Service at Austin, Texas. Ms. Woodall and Ms. Coutta were equal partners in El Paso Cosmopolitan *17 (hereinafter referred to as the partnership) throughout the years at issue, and engaged in no other income-producing activity. The partnership operated side-by-side nightclubs with a common dividing wall, one called the Naked Harem Show Bar (the Naked Harem) and the other called the El Paso's Cosmopolitan Topless Show Bar (the Cosmopolitan). The partnership had four checking accounts, two at Continental National Bank and two at Surety Savings, over the course of the years at issue. During this period, petitioners had a total of five personal checking accounts at El Paso National Bank, State National Bank, and Surety Savings, three of which were in both their names and two of which were in the name of Ms. Coutta. Both petitioners had signature authority for all of the accounts, partnership and personal. During the first week of April in 1982, the Cosmopolitan sustained extensive fire damage. An attorney retained by the partnership pursued an insurance claim with Amherst Insurance Company, basing the amount of the claim on a list of destroyed items prepared by Ms. Woodall a few weeks after the fire. This list included purchase dates (generally by month and year but sometimes *18 only by year) and original costs of the destroyed property. An eventual lawsuit against the insurance company sought $ 120,000, with $ 30,000 of that amount designated as attorney's fees. Despite a default judgment for the full $ 120,000 in October of 1982, the partnership had no reasonable prospect of recovery at the end of 1982, and in fact never recovered anything, because of the insolvency of the insurance company. Between two and three weeks after the Cosmopolitan fire, the Naked Harem sustained extensive fire damage. The partnership filed a claim for $ 122,500 with Kenilworth Insurance Company, but ultimately recovered a total of $ 50,000, in June of 1983, from State of Texas authorities overseeing the receivership estate of the company. With $ 25,000 of this recovered amount, the partnership in 1983 obtained a certificate of deposit at Continental National Bank. The partnership reopened its businesses in August of 1982. On its 1982 return, prepared by Tim Sarabia and signed by Ms. Woodall, the partnership claimed a deduction of $ 78,441.77 for "Loss, due to fire, Equipment and Fixtures." The Schedule L balance sheet in the return shows an adjusted basis in depreciable *19 assets at the beginning of 1982 in the amount of $ 8,451. During 1983, the partnership expended $ 25,272 in repairing fire damage, and this amount was deducted on the 1983 partnership return. The partnership also purchased replacement assets for $ 13,093, which were capitalized and depreciated on the 1983 return. The partnership reported its $ 50,000 recovery for the Naked Harem fire damage as taxable income on the return. The partnership leased the nightclub premises from 1977 until August of 1983, at which time it purchased the real property, including improvements, from the lessor for $ 245,000. This amount coincides with the 1984 value determined by the Central Appraisal District in El Paso, which allocated $ 124,950 to the improvements and $ 120,050 to the land. The depreciation schedule in the 1983 partnership return states the cost of the property as $ 275,000, with $ 75,000 of that amount allocated to the land. The partnership and both petitioners used the cash basis method of accounting for Federal income tax purposes. At the time of respondent's audit, there were no available partnership records for 1982 and 1983 other than bank records. The partnership did not *20 use a double-entry system of accounting during any of the years at issue. In his notices of deficiency, which are in all relevant respects the same for both petitioners, respondent increased the partnership's income for each of the years at issue and allocated a one-half distributive share to each petitioner. Respondent used the bank deposits and cash expenditures method to reconstruct the gross receipts of the partnership, incorporating both partnership and personal bank accounts. The basic figures used in the reconstruction are stipulated and hereby incorporated into these findings. The figures necessary to the resolution of disputed issues are set forth in the opinion portion of this Memorandum. For 1982, respondent also disallowed $ 69,991 of the partnership's claimed fire loss. For 1983, respondent disallowed the partnership's claimed deduction of $ 25,272 for repairs, and depreciation and tax deductions totaling $ 7,520. For 1984, respondent disallowed partnership depreciation and tax deductions totaling $ 11,671. OPINION Before turning to the principal issues, we note briefly those of respondent's adjustments that petitioners have not contested. Respondent determined *21 that the partnership's claimed 1983 deduction of $ 25,272 for repairs should have been capitalized and depreciated rather than deducted in full. Respondent also disallowed unsubstantiated tax deductions for 1983 and 1984 totaling $ 11,227, and recomputed the 1983 and 1984 building depreciation allowances using a cost basis of $ 124,950 rather than the reported $ 200,000. Petitioners have neither offered evidence nor argued on brief that these adjustments were erroneous. We accordingly treat these issues as conceded by petitioners, subject to any adjustments necessitated by our disposition below of the section 1033 issue. Fire Loss Deduction
Section 165(a) allows a deduction for a loss sustained during the taxable year that is not compensated for by insurance or otherwise. The amount of the deductible loss is limited, however, to the adjusted basis used in determining a loss from the sale or other disposition of property. Sec. 165(b); sec. 1.165-1(c)(1), Income Tax Regs. The partnership return for 1982 shows a claimed fire loss deduction in the amount of $ 78,442. Respondent disallowed $ 69,991 on the ground that the balance sheet in the partnership return lists a total *22 adjusted basis of only $ 8,451 for partnership depreciable assets at the beginning of 1982. In preparation for filing a claim with Amherst Insurance Company in 1982, Ms. Woodall had prepared a list of items, including dates of purchase and original costs, destroyed in the Cosmopolitan fire. At trial, petitioners introduced into evidence a schedule, prepared by a certified public accountant one week before trial, that uses Ms. Woodall's list as the starting point in computing adjusted bases at the time of the Cosmopolitan fire. This schedule arrives at a total adjusted basis of $ 77,148, which is approximately $ 1,300 less than the claimed fire loss but over $ 68,000 above the adjusted basis from the balance sheet in the return. Petitioners maintain that the adjusted basis appearing in the partnership balance sheet was mistakenly understated by the return preparer and that the correct adjusted basis, to be used for purposes of the section 165 limitation, is $ 77,148. Section 165(b), which limits the deductible loss to adjusted basis, refers to section 1011 as defining the applicable adjusted basis. Section 1011, in turn, incorporates the adjustments of section 1016, which provides: *23 (a) GENERAL RULE. -- Proper adjustment in respect of the property shall in all cases be made -- * * * (2) * * * for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount -- (A) allowed as deductions in computing taxable income under this subtitle or prior income tax laws, and (B) resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer's taxes under this subtitle * * * , or prior income, war-profits, or excess-profits tax laws, but not less than the amount allowable under this subtitle or prior income tax laws. * * *
Thus, a taxpayer's cost basis in property is decreased for accumulated depreciation by the greater of: (1) the amounts allowed as deductions in computing taxable income, to the extent those amounts resulted in a reduction of income taxes, or (2) the amounts allowable. Sec. 1.1016-3(a)(1), Income Tax Regs. See Texaco Inc. v. United States, 217 Ct. Cl. 416, 421, 579 F.2d 614, 616 (1978); Computing & Software, Inc. v. Commissioner, 65 T.C. 1153 (1976).An amount has been "allowed" in a prior year if the Commissioner has *24 not challenged it. Kilgroe v. United States, 664 F.2d 1168, 1170 (10th Cir. 1981).An amount is "allowable" for a prior year as determined under the law applicable to that year. Sec. 1.1016-3(f)(1), Income Tax Regs. In the case of property held by a partnership, the computation of the tax-benefit amounts allowed takes into account the tax benefits at the partner level. Sec. 1.1016-3(e)(4), Income Tax Regs.
The implication of a reported $ 8,451 adjusted basis is that deductions in prior years (i.e., amounts "allowed") had left only that much unrecovered basis. Petitioners did not call Tim Sarabia, who prepared the 1982 partnership return, as a witness to establish otherwise. Partnership returns for years prior to 1982 are not a part of the record, nor does the record disclose who prepared those returns. The only evidence relating to the derivation of the reported $ 8,451 adjusted basis is the testimony of Ms. Woodall, who handled income, expenses, finances, and asset purchases for the partnership. When specifically questioned about the balance sheet amount, she stated that she did not know how Mr. Sarabia had arrived at that figure. She demonstrated through her testimony *25 on cross-examination that she herself lacked any meaningful understanding of tax depreciation and its relationship to adjusted basis. Petitioners have the burden of proof on this issue. Rule 142(a). The failure of taxpayers to introduce possibly favorable evidence within their control, while attempting to sustain the burden of proof, gives rise to an inference that the evidence would have been unfavorable. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).Petitioners have not argued that Mr. Sarabia was unavailable to testify, nor have they justified their failure to introduce pre-1982 returns (partnership or individual) or testimony by the preparer(s) thereof. We infer that this evidence would have been unfavorable to petitioners, establishing that in prior years the partnership claimed excessive deductions for the later-destroyed property, with resulting full tax benefits to the partners. See Sec. 1.1016-3(e)(5), Income Tax Regs. ("A taxpayer seeking to limit the adjustment to basis to the tax-benefit amount allowed for any period, in lieu of the amount allowed, must establish the tax-benefit amount allowed."). *26 Respondent's disallowance of $ 69,991 of the partnership's claimed fire loss deduction is sustained. Section 1033 Involuntary Conversion
Section 1033(a) provides generally that gain is recognized on property involuntarily converted into money only to the extent that the amount realized upon conversion exceeds the cost of replacement property purchased within a specified time. The replacement property must be "similar or related in service or use" to the property converted. Sec. 1033(a)(2)(A). The money involved here is the $ 50,000 the partnership recovered from Texas authorities in June of 1983 for damage caused by the Naked Harem fire. Although the partnership reported this amount as taxable income on its 1983 return, petitioners now assert that such treatment was erroneous. Petitioners first argue that the partnership used the $ 50,000 to purchase a fee ownership interest, in August of 1983, in the previously leased real property. Because the cost of the property, $ 245,000, exceeded the amount realized on conversion, $ 50,000, petitioners contend that the entire $ 50,000 is nontaxable in 1983. Petitioners cite Davis Regulator Co. v. Commissioner, 36 B.T.A. 437 *27 (1937), and Rev. Rul. 83-70, 1983-1 C.B. 189, for the proposition that replacement of a leasehold interest with a fee interest qualifies for section 1033 nonrecognition treatment. As respondent points out, the simple response to this position, and the distinction from petitioners' cited authority, is that the partnership's leasehold interest was not involuntarily converted by the fire. Instead, the leasehold interest was unaffected by the fire and was later voluntarily converted into the fee interest. Petitioners argue in the alternative that the partnership paid $ 38,365 for replacement property in 1983, including $ 25,272 designated as repairs on the partnership return. Under this alternative position, the 1983 taxable portion of the $ 50,000 is limited to $ 11,635. Given our holdings above that the $ 25,272 repair amount is not deductible in 1983 and that the allowable fire loss deduction is only $ 8,451, respondent does not dispute that the $ 38,365 expended by the partnership in 1983 qualifies for nonrecognition treatment. We accept the consistent positions of the parties on this point. We also conclude that the difference between $ 50,000 and $ 38,365 is recognizable *28 gain under section 1033(a), rather than partially tax-benefit income associated with the 1982 fire loss deduction. See Sec. 1.165-1(d)(2)(iii), Income Tax Regs.; Montgomery v. Commissioner, 65 T.C. 511 (1975).Conforming adjustments to depreciation allowances and investment tax credits will be addressed in the Rule 155 computation. Bank Deposits and Cash Expenditures Method
Where the taxpayer, as in the instant case, has inadequate records, this Court approves of the use of the bank deposits and cash expenditures method (hereinafter sometimes referred to as the bank deposits method) to reconstruct the taxpayer's income. Parks v. Commissioner, 94 T.C. 654, 658 (1990); Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978); Harper v. Commissioner, 54 T.C. 1121, 1129 (1970).As a general rule, when the Commissioner determines that deposits are income, the taxpayer bears the burden of proving that the determination is erroneous. Estate of Mason v. Commissioner, 64 T.C. 651, 657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Respondent determined that the partnership in this case had unreported income of $ 12,195 for 1982, $ 44,667 for 1983, and $ 39,177 for 1984. *29 Respondent then took these amounts into account in determining the distributive shares of partnership income taxable to the respective partners. See Sec. 702(a). Respondent's computations of the partnership's unreported income are complex because the partners, who had no income source other than the partnership, deposited some of the business receipts in their personal bank accounts rather than the partnership accounts, paid some partnership expenses from personal accounts and some personal expenses from partnership accounts, and in the process made numerous cash expenditures. As a preliminary matter, we observe that there are few decided cases involving the use of the bank deposits method to determine partnership taxable or ordinary income. Contrary to one of petitioners' arguments, however, if the same cautions which apply in the use of that method in the case of an individual are observed, we know of no reason why that method may not be used in the partnership context. See, e.g., Estate of Roe v. Commissioner, 36 T.C. 939 (1961).This is true even though, as in the instant case, the total bank deposits include amounts from partnership operations deposited into nonpartnership *30 accounts. See, e.g., United States v. Slutsky, 487 F.2d 832 (2d Cir. 1973). Petitioners argue, nevertheless, that the notices of deficiency are arbitrary and capricious, and thus not entitled to a presumption of correctness. Petitioners' principal ground for this contention is that an inexperienced revenue agent, whose computations are the foundation of the notices of deficiency, made several substantial errors in attempting to apply the bank deposits method. Even if the agent made some errors in applying the bank deposits method, however, the errors do not invalidate the method. Marcello v. Commissioner, 380 F.2d 494, 497 (5th Cir. 1967), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court; Harper v. Commissioner, supra at 1127.Furthermore, as discussed immediately below in the context of whether respondent's income adjustments are erroneous, we find that the alleged errors are for the most part not errors at all. The notices of deficiency are not arbitrary and capricious. The first step in respondent's computations was the determination of total bank deposits. The stipulation of facts summarizes the account activity for each *31 of the partnership accounts and each of the partners' personal accounts. The total deposits taken from the account activity were adjusted downward for transfers between accounts, redeposits of checks which were not paid when initially presented, loan proceeds, and checks drawn to cash. The total deposits and deposits as adjusted are as follows: 1982
1983 1984 Total deposits
$ 95,748
$ 186,670
$ 235,376
As adjusted
76,132
158,073
206,424
Underlying this determination is the premise that, as stipulated, the partners had no income source other than the partnership. We understand that there is no dispute as to the accuracy of these amounts. Petitioners argue, however, that the deposits to petitioners' personal accounts were distributions by the partnership and as such are not taxable. Petitioners are, of course, correct that partnership distributions as such are, generally speaking, nontaxable to the partners. Sec. 731(a). In the instant case, however, respondent reconstructed the income of the partnership. The funds deposited in the personal accounts were business receipts of the partnership which, except for certain transfers between accounts, had not *32 been first deposited in a partnership account. The deposits in the personal accounts thus were treated not as distributions of partnership income, but as partnership gross receipts diverted to the partners' personal accounts. We find no error in this treatment. Petitioners challenge the deposits on another ground, focusing on deposited customer checks. These were checks written by third parties, to nightclub customers, which the partnership cashed for the customers and then deposited. The amounts were $ 5,939 in 1982, $ 29,747 in 1983, and $ 20,738 in 1984. Petitioners maintain that cashing a check in these circumstances is a nontaxable transaction by the partnership, and that the ultimate deposits merely offset cash paid out. The revenue agent had a different view, however, testifying that she assumed the cash paid out constituted otherwise undeposited gross receipts from that day's business. She testified she was advised that the partnership kept $ 250 in petty cash on hand to cash customer checks and "From the business they take it [the $ 250] home, and then from home every day they would take it back." In the agent's view, the deposited amount of the customer checks was *33 appropriately included in bank deposits and, ultimately, in approximated partnership gross receipts. Petitioners have not adequately rebutted what we consider to be a reasonable assumption by the agent. As a final point relating to the determination of total bank deposits, petitioners contend that the agent mistakenly treated the partnership's $ 50,000 recovery for the Naked Harem fire as deposited taxable income. The agent did indeed include the recovery in 1983 total bank deposits. That treatment was not erroneous, however, because the income aspect of the $ 50,000 later dropped out of the computations. After reconstructing a partnership gross receipts amount for 1983, which includes bank deposits attributable to the $ 50,000, the agent reached an "unreported income" number by subtracting income "per return" of $ 145,408, which also includes the $ 50,000 recovery. In short, the $ 50,000 deposit (treated as an addition to income) was totally offset by the $ 50,000 "per return" component (in effect a subtraction). The result is the same as if the agent had omitted the recovery from total bank deposits and had also omitted it from the "per return" amount. Because the agent's *34 computations in effect ignored the $ 50,000 recovery, our holding above that section 1033 limits the 1983 taxable portion to $ 11,635 does not affect the accuracy of the bank deposits reconstruction. Under respondent's bank deposits and cash expenditures method, the second part of the income reconstruction determined the amount of cash expenditures includable as unreported income. The notices of deficiency include the following computations of the cash expenditures for 1982: TABLE 1 Computation of expenses paid by cash vs. check:
Balances 1-1-82
9,882 Add: deposits
95,748 Less: Balances 12-31-82
(5,796)
Add: Checks written in 1982, cleared 1983
1,138 Less: Checks written in 1981, cleared in 1982
(7,337)
Total checks written
93,635 Less: Nonbusiness checks
Checks drawn to cash
8,825 Transfers
1,590 Redeposits
200 10,615 Total business checks
83,020 Deductions per return (+ purchases)
160,366 Non-cash expenditure --
Loss claimed on return
(78,442)
Loan repayment to Continental Bank
2,500 Personal Living expenses per
Continental Bank of 7,285
All State Natl. Bank + El Paso Natl.
23,361 107,785 Expenses paid by cash
24,765 *35 The computations for 1983 and 1984 follow the same format. Petitioners make a series of attacks on the revenue agent's cash expenditures determinations. The format of Table 1, however, is not as clear as it might be. To assist in dealing with some of petitioners' arguments, we have recast Table 1, using the same figures (somewhat rearranged) and reaching the same result, but using headings that are more explanatory, as follows: TABLE 2 Step 1: Total expenditures paid by check
Balances 1-1-82
9,882 Add: Deposits
95,748 Less: Redeposits
(200)
Less: Balances 12-31-82
(5,796)
Add: Checks written in 1982, cleared 1983
1,138 Less: Checks written in 1981, cleared 1982
(7,337)
93,435
Step 2: Checks not used for claimed return deductions
Checks drawn to cash
8,825 Transfers
1,590 Personal living expenses per
Continental Bank of 7,285
All State Natl. Bank + El Paso Natl.
23,361 Loan repayment to Continental Bank
2,500 36,276
Step 3: Checks used for claimed return deductions
57,159
Step 4: Outlays from partnership return
Deductions per return (+ purchases)
160,366 Less: Fire loss claimed on return
(78,442)
81,924
Step 5: Cash used for claimed return deductions
24,765
*36 The recast format for 1983 and 1984 would be essentially the same as that in Table 2. Step 2 for these years would include loan repayments made in 1983 and 1984, capitalized asset purchases in 1983, and payments on an Oldsmobile in 1984. Step 4 for these years would subtract depreciation rather than a claimed fire loss. The agent admitted at the trial to some inadvertent doublecounting in her calculations. Petitioners did not, however, establish the precise nature or scope of the admitted mistake. Our examination of the worksheet used by the agent to compute personal expenditures paid by check (i.e., "Personal living expenses" in Tables 1 and 2) discloses that this item includes checks drawn to cash. A comparison of this worksheet with the stipulated bank account activity and a comparison of the stipulated bank account activity with Table 1 discloses a doublecounting. For 1982, the amount of $ 1,825 was double-counted to petitioners' detriment, once as part of the "Checks drawn to cash" and once as part of the "Personal living expenses." The amounts of $ 1,000 for 1983 and $ 2,099 for 1984 were likewise double-counted. We find that respondent's income adjustments at the partnership *37 level are overstated by these amounts. Petitioners contend that the agent impermissibly treated personal living expenses as amounts that increased partnership cash expenditures. On first glance at Table 1, petitioners' contention may appear to be correct. Closer analysis, however, shows otherwise. In Table 2, personal living expenses of $ 23,361 are shown under the heading "Checks not used for claimed return deductions" in step 2, and the total of those checks, $ 36,276, is subtracted from the "Total expenditures paid by check," $ 93,435, to arrive at the total amount of "Checks used for claimed return deductions," $ 57,159. The total return deductions involving expenditures, including purchases, amount to $ 81,924 and this figure exceeds the amount of checks used for claimed return deductions by $ 24,765. This last figure was determined to be the partnership's cash expenditures and was added to bank deposits in determining the partnership's unreported income. We find no error in this treatment of the personal living expenses. Petitioners contest the treatment of personal living expenses for another reason. As the premise of a double-counting argument, petitioners state that *38 the agent calculated the following amounts for personal living expenses: 1982
1983
1984
Paid from personal accounts
$ 23,361
$ 27,317
$ 38,800
Paid from partnership accounts
7,285
7,183
5,308
Petitioners err. It is apparent from the stipulated bank account activity that what petitioners describe as amounts "Paid from personal accounts" represent checks drawn on both partnership and personal bank accounts. The stipulated bank account activity for 1982 shows, for example, that checks drawn on the personal accounts for personal expenses totaled $ 16,075 and that checks drawn on the partnership accounts for personal expenses totaled $ 7,285, a sum of $ 23,360. (The discrepancy of $ 1 is not explained but is presumably the result of rounding numbers.) Except to the limited extent already described in the context of the agent's admitted mistake, we find no doublecounting of personal living expenses. Petitioners next challenge the agent's treatment of partnership expenses paid from petitioners' personal checking accounts, stipulated to be $ 3,350 in 1983 and $ 7,550 in 1984, and the agent's treatment of what the 1983 partnership return shows as a capital contribution *39 to the partnership of $ 16,172. Petitioners contend that the partnership expenses totaling $ 10,900 should have been allowed as deductions, and that these partnership expenses and the purported capital contribution "are nontaxable deposits which the agent treated as being taxable." Petitioners again miss the point. As to the partnership expenses paid with personal checks, it is true that these amounts do not appear as explicit downward adjustments in the agent's income reconstructions for 1983 and 1984. Table 2, [2] however, indicates that the dollar amount of checks used for claimed return deductions (step 3) is backed into as a simple computation (step 1 amount minus step 2 amount); the step 3 amount is not compiled independently. In other words, the partnership expense amounts contested by petitioners are part of the step 3 amounts for 1983 and 1984. Looked at from another perspective, the step 2 "Personal living expenses" paid by check already accounts for petitioners' concern in that the portion of that amount which is derived from personal accounts is equal to total checks written from personal accounts less those written for partnership expenses ($ 3,350 for 1983 and $ *40 7,550 for 1984). Petitioner's argument regarding the nontaxability of capital contributions is also not persuasive. The agent testified that her examination uncovered no checks that looked as if they represented capital contributions to the partnership. Petitioners, for their part, introduced no evidence that would tend to corroborate the capital contribution amount showing on the 1983 partnership return. The reported amount, even if accurate, could in fact represent contributed property rather than cash, and contributed property would have no effect on the agent's computations. Even if the contributed amount was in cash, petitioners have not shown why it should be considered a nontaxable bank deposit. The contributed amount could just as well represent partnership gross receipts that were first deposited only after their *41 contribution as "capital." Petitioners also assert that checks written to cash from the partnership accounts were improperly treated as additional income. The agent's computations assume that the cash was not used for claimed deductions and, in this sense, these checks do cause the step 5 amount in Table 2 to be higher than it otherwise would be. In other words, if these checks were assumed to be for claimed deductions, the step 2 amount would be lower, the step 3 amount would be correspondingly higher, and the step 5 amount would be correspondingly lower. Although Ms. Woodall testified that partnership checks written to cash were used to pay suppliers who would not accept checks, she has not persuaded us. Ms. Woodall stated that many suppliers would not accept checks from nightclubs, but gave no reason why that should be the case. She also stated that many suppliers would not accept checks "until you have been in business for years." The record does not disclose precisely when the nightclubs began operating, but the partnership first leased the premises in 1977 and the 1984 partnership return states that the business began in 1979, three years before the first year at issue. *42 Ms. Woodall did not suggest that the partnership had a poor credit rating or had been delinquent with specific suppliers in the past, both plausible reasons for required cash payments. Finally, Ms. Woodall named none of the cash-requiring suppliers and there is no other evidence, either in the form of testimony or documentation, corroborating her vague testimony. Section 6653(a) and 6661 Additions to Tax
Petitioners contest the determined additions to tax on the sole ground that there is no deficiency for any of the years at issue. We have concluded that there are deficiencies for these years, albeit not in the precise amounts determined by respondent. Accordingly, each petitioner is liable for the additions to tax in amounts to be decided under the Rule 155 computation. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect for the years at issue. Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The table is not directly applicable because it covers only 1982, while the amounts in question relate to 1983 and 1984. The agent's methodology, however, was consistent from year to year.↩